WILLIAM C. WONSON & another *vs.* SAMUEL WONSON & others.

Upon proceedings under *St.* 1864, *c.* 306, for the division of flats, any question of title by disseisin should be tried and determined before the appointment of commissioners.

Upon proceedings under *St.* 1864, *c.* 306, for the division of flats in a cove, the boundaries of the flats included in the cove are to be ascertained, where there is nothing in the form of the adjoining shore to affect it, by drawing a base line across the cove from headland to headland at ordinary high water mark, and side lines at each end of the base line and at right angles with it to extreme low water mark; but if either side line, so drawn, would conflict with a similar side line of the cove next adjoining, the dividing line between the two coves is to be projected at an equal angle to the base line of each cove.

In a cove from which the tide never wholly ebbs, the flats are ordinarily to be divided among the proprietors of the upland by giving to each proprietor the same proportion in width at extreme low water mark as at ordinary high water mark, and drawing the dividing lines straight from the inner to the outer line.

PETITION to this court under *St.* 1864, *c.* 306, by William C. Wonson and James Davis for the division of flats in Coos's Cove in the harbor of Gloucester. The petitioners alleged that they were respectively seised of adjoining parcels of land and flats in that cove, together with the buildings and wharves thereon, bounded and described as in the petition. The material part of the description of said Wonson's estate (after describing its boundaries upon the upland) was as follows: " The width of said parcel, from the land of Davis to the land of Samuel Wonson, (the point begun at,) being one hundred and eighty-five feet along the line of the upland and what was the line of high water mark prior to the erection of a wharf between the points named; and thence from the point named at high water mark at land of Davis in a westerly direction over the flats and by flats of said Davis to low water mark; thence in a southerly direction by low water mark to flats of said Samuel Wonson; thence by flats of said Wonson in an easterly direction to the point first mentioned at high water mark." The material part of the description of the estate of James Davis was as follows: From " high water mark at land of said William C. Wonson above described; thence in a westerly direction over the flats, and by the flats of said Wonson, to low water mark

thence in a northerly direction by the line of low water mark to the flats of William Parsons 2d, Thomas L. Parsons, Eben Parsons and George Parsons; thence in an easterly direction by the flats of the said Parsonses to a point at high water mark at land of the said Parsonses; the width of said parcel from said point to the land of said William C. Wonson at high water mark being one hundred and thirty feet along the line of the upland and what was the line of high water mark prior to the erection of a wharf between the points named upon the° flats herein described." "And the petitioners say that their flats described above are the flats respectively appurtenant to and belonging to the upland of these petitioners respectively as described; that Coos's Cove is a deep and circular cove in the harbor of Gloucester, the flats whereof are covered by high water, and that the owners of the land abutting upon said cove and the flats adjacent and belonging thereto, and within the said cove and the headlands of the same are, as follows, viz.: the said William Parsons 2d, Thomas L. Parsons, Eben Parsons and George Parsons, being tenants in common of the upland and the flats belonging thereto from the northern headland of said cove, along the same to the land and flats of Davis above described; the said James Davis and the said William C. Wonson being owners of the lands and flats respectively above described; and the said Samuel Wonson being seised of the upland and the flats belonging thereto, from the land and flats of said William C. Wonson above described, along said cove to the southern headland of the same. And your petitioners further say that they cannot possess, occupy and improve the flats above described, as belonging to them respectively, while their ownership respectively in the same and the boundaries thereof are not settled and determined; and from the form of said cove, the boundary lines upon said flats of the several owners of the same cannot be settled and determined, except by the assent or agreement of all the said owners of land upon said cove and between the headlands thereof; and they further say that the said Samuel Wonson and the said Parsonses, though often requested will not agree upon and determine the ownership and boundaries

of your petitioners upon said flats, and that your petitioners cannot therefore well settle and determine the boundary line and the ownership of said flats as between themselves. Wherefore they pray that notice may be issued in due form of law; and that their ownership in such flats respectively and the boundaries thereof may be settled and determined."

The court appointed three commissioners to divide the flats, who, after having met and heard the parties and with them examined the premises, made the following report:

" The uplands of the parties as described in said petition border upon a deep salt water cove in Gloucester, in said county, called Coos's Cove, a plan of which, correctly drawn, with the lines and bounds of the several parties upon the line of high water, made by A. Boschke, civil engineer, is herewith submitted," the material part of which and of a transcript thereof afterwards mentioned in the report was as follows:

" The limits and boundaries of the propriety of the parties in the flats adjoining their uplands aforesaid have not been marked out or determined, except so far as the same are indicated by the wharves and structures of the respective parties erected thereon as the same are marked upon said plan. All of said wharves have been constructed and used by said parties in severalty for the purpose of laying vessels thereat for a period of twenty years and more prior to the date of the filing of the petition in this case, except portions of two wharves, to wit: twenty feet of the outer or southerly end of the wharf of the respondents Parsons and twelve feet of the outer or northwesterly end of the wharf of said Samuel Wonson, which last have both been erected within that time.

" The original line of high water at ordinary high tides prior to the erection of the wharves aforesaid, with the extent of the ownership of the parties respectively thereon, is correctly marked upon said plan. The line of low water beyond which the tide never ebbs is within the headlands of said cove and within a hundred rods from said high water line. We were not able from observation or by testimony to fix the line of low water as it now is at the lowest ebb tide, and still less the line of the lowest ebb as it was at the time when the line of high water was as it is marked upon the plan; and inasmuch as this line must be a shifting line, dependent upon the effects of changing currents, affected by the filling in and building wharves upon the flats, and the increasing deposits upon the bottom of the cove, and as the plan of division which we have adopted does not require it, we have not deemed it material to ascertain it. The approximate line marked upon the plan is, however, substantially correct, and the parties consent that the same may be taken and treated as the true line of low water if in the opinion of the court it shall become material.

" No rule to our knowledge having been established for the division of flats in a cove of this description, out of which the tide never entirely ebbs, nor any rule of division in any case adopted, which is capable of a general application to shores of different shapes, it was suggested to us that the mode

heretofore adopted in some cases, claimed to be analogous to the present, of deep coves out of which the tide entirely ebbs, to wit: by drawing a line across the mouth of the cove between the headlands and giving to each shore owner his proportionate length of flats on that line, should be followed in this. But we were of opinion that this mode was not properly to be applied to this case, or to cases of coves from which the tide does not wholly ebb at the lowest tide, inasmuch as the base line upon which the division would be made must pass outside of the limits of the ownership of the parties, and where no actual measurements or monuments could be had.

" And we deemed it incumbent on us to adopt a mode which shall secure to the parties a proportionate share of the flats within the limits of the cove, in the direction of low water, in the ratio as the length of their respective ownerships upon the line of high water. And in ascertaining the limits of the cove for this purpose we were of opinion that we ought not merely to include the flats inside and between the headlands of the cove, but that we ought also to include a portion of the flats lying off the headlands and to low water mark or a hundred rods. And we have established the boundaries of such flats and of the cove for this purpose in manner following, being in our opinion one substantially accurate, and of more easy practical application than any other, to wit: we have drawn a tangent line from headland to headland, and at the point where it touches the northerly headland have erected a perpendicular to said tangent as the northerly boundary to low water mark — there being nothing in the form of the northerly adjoining shore to require a less angle than a right angle — and at the southerly end at the point of junction we have drawn a line from the shore to low water mark at an angle of 74 deg. 53 min. from said tangent line that being one half of the angle formed by said tangent line and a tangent line drawn across the adjoining cove from headland to headland, as the southerly limit of the flats of the cove to be divided, as the same are indicated upon the plan.

" And we have adopted the following mode of division as one fair and proper in this case, to wit We fix the boundaries by

division lines drawn through a series of points or lines between the established limits of the cove equidistant from the line of high water, which points are found by dividing said equidistant lines in the ratio as the length of the lines of upland owned by the parties on said high water line, giving to each shore owner his proportionate share of the area of each belt of flats thus formed around the cove, until the limit of his ownership in the direction of low water is reached; the said belts as represented upon the plan being ten feet in width; the division lines so ascertained being represented upon the plan by the irregular and curved lines from the bound marks on high water line to low water line," (and marked, on the plan, *ante,* **73,** A 1, B 1, C 1.) " It was objected to this mode, that it gives division lines of boundary, curved and irregular and not adapted to the construction of wharves upon the premises. But we have considered that the use for construction of wharves is not the sole purpose for which the premises are valuable, nor the purpose for which such property is always of the most value, and that by law the right of occupation of flats adjoining the upland is not co-extensive with the ownership; since it cannot ' stop or hinder the passage of boats or vessels to other men's houses or lands.' And further that the courses of these lines will not be more irregular than the shore lines, upon which they depend, nor than the line of low water, nor than natural lines of boundary generally; and that they mark a division fair and proper in the premises, which gives to each owner his due proportion, and that the rule by which they are run is capable of a general application to coves of all shapes, and to headlands and shores of the open sea as well, giving to the shore owners in all cases their proportionate shares of the area of the adjoining flats, marked by boundary lines in the direction of low water upon the courses indicated by nature in the formation of the shore. And in accordance with this rule — except where the lines so drawn intersect the lines of the wharves aforesaid, in which case we define the boundary lines by the lines of wharf which have existed for twenty years or more — we find and report the boundary lines of the ownership of the petitioners in the premises as follows: "

[The commissioners then " apportioned and set out " to each of the petitioners by monuments, courses and distances, a parcel of flats, extending from high water mark upon the shore of his upland, to the line of low water at its lowest ebb.] " And we find and report the above to be the lines and boundaries of the ownership of the petitioners in the flats in question.

" At the request of the parties or some of them we have ascertained the results of a division of these flats by several other and different modes, to wit: by a division, in the ratio of the length of ownership on high water line, of the tangent line from headland to headland of the cove," (marked A 2, B 2, c 2, on the plan, *ante,* 73); " of the line of lowest low water between the established limits of the cove as above set forth," (marked A 3, B 3, c 3, on the plan); " also of the line of lowest low water that is inside of said tangent line," (marked A 4, B 4, c 4, on the plan); " all of which are marked out and shown upon the transcript of the aforesaid plan of the cove, which is also herewith submitted; and also the result of a division, in the same ratio, of the line of mean low water, marked upon the original plan aforesaid," (which last is omitted in the printed plan, as not tending to assist the understanding of the case). " And in the event that a division by either of those modes shall be held to be the correct one, the result of such division is correctly indicated upon said plan and transcript thereof."

The petitioners objected to judgment upon the report of the commissioners for the following reasons: " 1st. That the division reported by the commissioners is not the true and legal method for dividing the flats in said cove and determining the boundary lines of said petitioners. 2d. That the true method of division is in the ratio of the length of ownership of the petitioners respectively on high water line, upon the line of lowest low water between the established limits of the cove as determined in said report, or upon the tangent line between headland and headland; as these two methods of division are indicated upon the plans returned by said commissioners. 3d. That said commissioners should have divided the flats in said cove, and determined the boundaries of the petitioners, by setting

off to the petitiôners the flats appurtenant to their upland respectively, without reference to any wharves or structures upon the same."

The case was reserved by *Gray*, J., upon the petition, the report of the commissioners, the plans referred to therein, and the petitioners' exceptions thereto, for the consideration and determination of the full court. The parties agreed that if in any part of the report the commissioners had exceeded their authority, that part might be stricken out without affecting the rest of the report, if otherwise free from objection.

*W. C. Endicott*, for the petitioners.

*B. H. Smith*, for the respondent Samuel Wonson.

GRAY, J. By the well known colonial ordinance of 1647, " it is declared, that in all creeks, coves and other places about and upon salt water, where the sea ebbs and flows, the proprietor of the land adjoining shall have propriety to the low water mark, where the sea doth not ebb above a hundred rods, and not more wheresoever it ebbs further: provided that such proprietor shall not by this liberty have power to stop or hinder the passage of boats or other vessels in or through any sea, creeks or coves to other men's houses or lands." By this ordinance, the general court, almost upon the first settlement of the colony, declared the title of the land next below high water mark, which by the law of England belonged to the sovereign, to be in the proprietor of the adjoining land on the shore. The Province Charter expressly confirmed all titles " by or under any grant or estate duly made or granted by any general court previously held." And the principle declared in the ordinance has always been considered part of our common law, and has been extended by usage and practice to the whole Province and Commonwealth, including those parts which were not within the limits of Massachusetts at the time of its passage. Anc. Chart. 26, 27, 148, 149. *Commonwealth* v. *Alger*, 7 Cush. 70, 71, 76, 79, 80, 81. *Boston* v. *Lecraw*, 17 How. 432, 433. 9 Gray 514–518. See also *Nudd* v. *Hobbs*, 17 N. H. 526; *Dutton* v *Strong*, 1 Black, 32.

The ordinance declares the right in the most general terms,

**and,** while it clearly defines the distance to which private ownership in land shall extend into the sea, lays down no rules for determining the boundaries or divisions between coterminous estates. This want has been supplied by judicial construction, applying the principle of the ordinance to the facts of particular cases. The leading rules thus established may be reduced to three. First, the dividing lines are generally to be drawn in the most direct course from high water mark towards low water mark. *Walker* v. *Boston & Maine Railroad,* 3 Cush. 23. *Porter* v. *Sullivan,* 7 Gray, 443. *Attorney General* v. *Boston Wharf Co.* 12 Gray, 558. Second, wherever it is practicable, each proprietor is entitled to the flats in front of his upland of the same width at low water mark as at high water mark. *Valentine* v. *Piper,* 22 Pick. 96. *Gray* v. *Deluce,* 5 Cush. 12. Third, which is perhaps the fundamental rule, underlying and controlling all others, the flats are to be so divided as to give to each parcel a width at its outer or seaward end proportional to that which it has at high water mark. *Walker* v. *Boston & Maine Railroad,* 3 Cush. 23. *Gray* v. *Deluce,* 5 Cush. 12. *Porter* v. *Sullivan,* 7 Gray, 443. See also Resolve of Magistrates in 1683, 9 Gray, 521.

Where the general course of the shore approximates to a straight line, a compliance with all these rules is readily attained by drawing a straight line according to the general course of the shore at high water mark, and extending the side lines of all the estates at right angles with it towards low water mark. *Sparhawk* v. *Bullard,* 1 Met. 106. *Knight* v. *Wilder,* 2 Cush. 209. *Porter* v. *Sullivan,* 7 Gray, 443.

The diversity and irregularity in the form of the seashore often increase the difficulty of a just division, and make a universal adherence to all these rules impossible. Where, for instance, the general course of the shore line is much curved, either outwardly, as around a headland, or inwardly, as in a cove, the parcel of flats belonging to each estate cannot be of equal width throughout, but must expand or contract, accordingly as the outer line of the flats is longer or shorter than the line at high water mark. Around a headland, where the line is longer at

low water mark than at high water mark, where each proprietor
can have direct access to the sea without interfering with his
neighbors, and the only question is of the distribution of the
increase in the width of the flats, disputes rarely arise.

The most frequent and the most embarrassing questions con-
cern the division of flats in coves, bays or inlets, in which the
form of the shore, while it affords a shelter for vessels and thus
increases the value of the flats, makes it impossible to define
each estate by parallel lines from the upland towards low water
mark, without encroaching upon other estates; and it is often
difficult to make such a division as will give each proprietor
access to low water mark, to which all are equally entitled.
This difficulty is peculiarly felt when the title to the flats is
tried in the ordinary form of a real action between two parties
only, with no means of bringing all the proprietors of different
tracts of flats in the same cove before the court in one suit,
whereby all may be heard before the lines of any one are
established.

The *St.* of 1864, *c.* 306, has created a more convenient and
effectual method of adjudicating such questions, by providing
that one or more of the persons holding lands or flats adjacent
to or covered by high water may have the lines and boundaries
of the ownership in such flats settled and determined by a pe-
tition to this court, the proceedings upon which shall be analo-
gous to the ordinary form of proceedings for partition in a court
of common law under certain sections of the one hundred and
thirty-sixth chapter of the General Statutes, so far as the same
are applicable.

The sections thus referred to provide that a petition for par-
tition shall set forth the rights and titles, so far as they are
known to the petitioner, of all persons interested in the prem-
ises, who would be bound by the partition; that any person in-
terested in the premises may plead or answer to the petition any
matter tending to show that the petitioner ought not to have
partition as prayed for, in whole or in part, and thereupon the
further proceedings shall be conducted as in actions at common
law; that if upon the trial it appears that the petitioner is

entitled to have partition, whether for the share claimed in his petition or for any less share, the court shall award the interlocutory judgment that partition be made, and shall appoint com- missioners to make the partition and set off to the petitioner the share belonging to him, which shall be expressed in the warrant to the commissioners; and that if the report of the commission- ers is confirmed, judgment shall be rendered, affirming and establishing the partition. Gen. Sts. *c.* 136, §§ 6, 16, 20, 21, 29 32. If the parties, without raising any preliminary issue, agree to the appointment of commissioners to make partition, they cannot afterwards object to the want of an interlocutory judgment *quod partitio fiat. Symonds* v. *Kimball,* 3 Mass. 299. Any disputed question of title in the land to be divided must be raised and tried before the appointment of commissioners, and cannot be passed upon by them, or submitted to the court in their return. *Brown* v. *Bulkley,* 11 Cush. 168.

The title of the proprietors of lands bounding on a cove to the flats therein is somewhat analogous, though by no means pre- cisely similar, to the title of tenants in common in the common estate. Such proprietors are not indeed seised in common of all the flats to be divided; but each is entitled to a proportional share of the flats, as appurtenant to, or, more strictly speaking, as parcel of his upland estate; and the limits of each share are often so difficult to be ascertained that no one of the proprie- tors can safely undertake to build upon or improve the flats, without a judicial investigation and decision. The duty of commissioners appointed under the statute of 1864 is to define the lines and boundaries of that share of the flats to be divided, which belongs to the estate of each proprietor under the colo- nial ordinance, as it is the duty of commissioners appointed to make partition under the General Statutes to determine the boundaries in severalty of the share of each tenant in common in the land of which partition is to be made But in either case, if the title of any petitioner to the share, or part of the share, which he claims in the land or flats of which partition or division is sought, is denied upon the ground that it has vested by deed or disseisin in another person, the

effect of such deed or disseisin must be tried according to the course of the common law by the court and jury, before a warrant is issued to the commissioners. The commissioners therefore in this case had no authority to pass upon the question of title, depending upon possession and occupation by wharves or other structures for twenty years or more; and, according to the agreement made by the parties at the time of the reservation of the case for the full court, that part of their report must be stricken out. Such questions of title should properly have been raised, tried and determined before the appointment of commissioners, and the result stated in the warrant to them. But it is unnecessary to dwell longer upon this point, since it was announced by counsel at the argument that the parties had mutually agreed to make conveyances of the flats thus occupied, either in accordance with the lines of such occupation as actually found by the commissioners, or with an independent agreement between the parties in the country.

The court fully concurs with the commissioners in their view of the extent of the flats to be divided in these proceedings. The inner and outer limits of proprietorship under the colonial ordinance and the laws of the Commonwealth are well settled. The inner line is that of high water at ordinary tides. *Commonwealth* v. *Charlestown,* 1 Pick. 182. *Commonwealth* v. *Roxbury,* 9 Gray, 477, 483, 491. *United States* v. *Pacheco,* 2 Wallace, 590. Hale De Jure Maris, in Hargrave's Law Tracts, 12, 25, 26. The outer line, as determined by repeated decisions of this court, is that of extreme low water, if within one hundred rods, because it is often necessary to the enjoyment of the rights granted by the ordinance to have a wharf extend to low water mark when the tide ebbs the lowest. *Sparhawk* v. *Bullard,* 1 Met. 95. *Attorney General* v. *Boston Wharf Co.* 12 Gray, 558. The fifth mode of division reported by the commissioners, by ᴌnes running only to mean low water, need not therefore be further considered.

The natural monuments indicating the boundaries of the cove are the headlands on either side. As the flats belonging to part of the upland which lies within the headlands extend to low

water mark outside of a base line drawn across the mouth of the cove from headland to headland at ordinary high water, it is plain that the division cannot be confined to the flats within that base line; and we agree with the commissioners that the rule adopted by them, for ascertaining what flats outside as well as inside of that line are to be treated as within the boundaries of the cove, is substantially accurate, and of more easy practical application than any other. The simple and natural way of ascertaining what flats outside of the base line are to be considered as belonging to, and to be divided among, the estates within the cove, is to draw side lines at each end of the base line and at right angles with it to low water mark. *Gray* v. *Deluce,* 5 Cush. 13. The commissioners fixed the side line at the northerly headland in this manner, there being nothing in the form of the adjoining shore to require a variation in it. But at the southerly headland it appeared that the side line of this cove, if so drawn, would conflict with the side line, drawn on like principles, of the cove next adjoining; and as the line dividing the two coves could not therefore be extended at right angles to the base lines of both, it was properly projected at an equal angle to each base line, so as to distribute equally between the two coves the angle of flats which would be included between the lines drawn from that headland to low water mark at right angles to the base lines of the two coves respectively. An analogous rule has been adopted in Maine for the division of flats between adjoining estates. *Emerson* v. *Taylor,* 9 Greenl. 42. *Treat* v. *Chipman,* 35 Maine, 36. *Call* v. *Carroll,* 40 Maine, 31. The objections which have prevented this court from applying such a rule to private estates, the boundaries of which depend upon the acts of man and are therefore changeable and often artificial, do not hold good as between two coves or other sections of the shore, the bounds and monuments of which are natural and invariable.

All the flats within the limits of the cove as thus ascertained belong to the petitioners, or to the owners of the estates next adjoining theirs on either hand. It being admitted that there have been no conveyances or agreements which can affect the

case, it remains to be determined which of the various **modes of** division suggested in the report should be followed.

The court is clearly of opinion that the mode preferred and selected by the commissioners is erroneous. It is novel and unprecedented, utterly different from and inconsistent with any of the principles and rules which have been laid down or suggested in the adjudged cases, and evinces more scientific ingenuity than practical wisdom. It is artificial and complicated, requiring much mathematical skill, minute surveys and elaborate calculations, to apply it to particular cases. It does not give to each proprietor a width on his outer line either equal or proportional to that which he has at high water mark. It determines the width of each parcel of flats and the direction of the side lines thereof, neither by the natural line of low water mark, nor by a base line drawn between the natural monuments at the headlands of the cove, nor by the outer line of proprietorship ; but by a series of arbitrary lines, many of which fall partly within and partly without the flats to be divided, and which in the deepest parts of this cove lose even the apparent consistency and approximation to a series of parallels with which they begin at high water mark. The dividing lines do not run in the straightest and most direct course to any points on low water mark or the seaward limit of proprietorship ; but are curved and serpentine, making each lot of a shape peculiarly inconvenient for the building and use of wharves while the flats continue to be appropriated to the purposes of commerce and navigation, and equally difficult of sale or improvement after the flats shall have been filled up. And in this case, this mode of division bears with singular irregularity and injustice upon the petitioner Davis, giving him a disproportionately narrow strip of flats, especially at low water mark, as is manifest upon referring to the plan. The report must therefore be recommitted to the commissioners.

The ordinary mode, as recognized and established by the decisions of this court, of applying the general principles, stated **at** the beginning of this opinion, to the division of flats **in a cove, is to** take the whole length of the upland at **high water**

mark, ascertain each owner's proportion, and give him the same proportion on the low water line, and in the same order, and then draw the side lines straight from each proprietor's lines at high water to his corresponding points at low water. *Ashby* v. *Eastern Railroad,* 5 Met. 370. *Walker* v. *Boston & Maine Railroad,* 3 Cush. 22, 23. This mode of division is usually the simplest and the most convenient; it is governed by the natural and the legal lines of proprietorship; it extends from the inner to the outer limit of the tract to be divided; and it secures to each estate a proportional division of the flats and direct access to the sea. It is essentially the same rule by which accretions by alluvion upon the bank of a river or lake are divided among the riparian proprietors. *Deerfield* v. *Arms,* 17 Pick. 41. *Hopkins Academy* v. *Dickinson,* 9 Cush. 552, 553. *Jones* v. *Johnston,* 18 How. 150; *S. C.* 1 Black, 209. 3 Kent Com. (6th ed.) 428.

The court has sometimes been induced by the shape of the shore to adopt the base line of the cove, instead of the line of low water, as the line upon which to fix the proportional width of each parcel of flats; but in the leading instances in which this has been done there was no natural channel or other depression from which the sea did not ebb at extreme low tide within the base line of the cove, to affect the division; and either the cove was deep and of a shape requiring converging lines in order to give to each proprietor access to the sea and a due share of the flats, in which case each proprietor has been held entitled to a width on the base line proportional to his boundary at high water mark; or else the curve of the shore line was so shallow that a base line drawn from headland to headland would nearly accord with the general course of the shore, in which case the side lines of each parcel of flats have been extended at right angles with the base line. *Rust* v. *Boston Mill Corporation,* 6 Pick. 158. *Gray* v. *Deluce,* 5 Cush. 12. *Attorney General* v. *Boston Wharf Co.* 12 Gray, 553.

There may doubtless be other cases, the peculiar circumstances of which may require a modification of or departure from the general rule, and in which it may even be necessary, as suggested by Chief Justice Shaw in 3 Cush. 25, that each parcel of flats, after passing the mouth or narrowest part of the

cove, should widen and spread, in order to give to each owner his due proportion. And in ascertaining the length of the line, either at high water mark or at low water mark, the general line ought to be taken, and not the actual length of the line if it happens to be elongated by deep indentations or sharp projections. 17 Pick. 46. 1 Black, 223. But in this case there are no sudden or extraordinary indentations or projections, in either the inner or the outer line; and it is of great importance that the general rules which have been once deliberately adopted and acted on judicially, should be adhered to, whenever the form of the shore will permit, so as to leave as little as possible to the discretion of the court in individual cases.

The inward curve of the shore of this cove is, as all the parties admit, too deep, and departs too much from a straight line, to allow the flats to be divided by lines at right angles with the base line of the cove; and we are of opinion that in this case, in which that base line is far from parallel to the course of the outer limit of the flats to be divided, and in part outside of it, the commissioners rightly refused to follow the mode suggested, though not strongly urged, by the petitioners, of giving to each proprietor a width of flats on the base line proportionate to the width of his lot at high water mark, as indicated by the second set of lines in the report and plan; and that, for the reasons already stated, the appropriate mode of division is to give to each proprietor a front line at extreme low water mark proportionate in length to his shore line at ordinary high water mark, and to run the division lines of the flats straight from high water mark to low water mark, according to the third system suggested in the report and plan.

The fourth mode of division reported by the commissioners, which assumes so much of the extreme low water line as is within the base line of the cove for the line on which to fix the proportional width of each parcel at low water, would give to the owners of the estates next the mouth of the cove a proportional part of the flats within the base line and all the flats outside of that line, and is so palpably unjust that it has not been contended for in argument and requires no special consideration                          *Report recommitted.*