ATTORNEY GENERAL *vs.* BENJAMIN F. WOODS.

A place in a river where the water rises and falls two feet with the flow and ebb of the tide is within tide waters, although the fluctuation is caused by the meeting of the sea water with the river water.

Tide water navigated for pleasure is navigable water, although the craft on it have never been used for purposes of trade or agriculture.

The remedy by injunction at the relation of the harbor commissioners, under the St. of 1866, *c.* 149, § 5, against unlawful erections or works within tide waters flowing into a harbor, is cumulative, and may be applied in any such case within the statute.

INFORMATION in equity, filed by the attorney general on August 1, 1870, at the relation of the harbor commissioners, to restrain the building and rebuilding of a dam across Mystic River, a little below the lower Mystic Pond, to the obstruction of the waters of the river and of the enjoyment thereof, and to the great injury, and common and public nuisance of all the citizens, and a public nuisance under the St. of 1866, *c.* 149, at a place alleged to be within the tide waters flowing into the harbor of Boston, at which the sole property in the bed of the river was in the Commonwealth, and at which the river was navigable and was and immemorially had been rightfully used by the citizens of the Commonwealth for the purposes of navigation.

The answer denied the allegations of the information ; alleged that the relators had no interest in or control or jurisdiction of the subject matter, except that which they might have in common with other citizens ; and further alleged that, for any wrong or injury which the defendant might by any possibility work to the Commonwealth, or any of its citizens, by any dam or structure which he had built or maintained, there was a plain, adequate and complete remedy at law.

At the hearing, before *Gray,* J., upon information, answer, a general replication and the proofs, the defendant relied on the objection that the remedy at law was plain, adequate and complete ; and also contended that the information, as framed, could not be supported without proof that the river was navigable at the place in question ; and the case appeared to be as follows :

At that place the defendant in 1851 built a bank wall on the West Cambridge (now Arlington) side of the river, extending thirty-two feet into the river, and a mill thereon, (which was not complained of,) and in a line therewith across the river to the Medford bank placed a sill at the bottom of the river, and erected thereon a dam, supported by posts and stakes, leaving a passage of about ten feet in the middle of the river next the mill, which he obstructed by using flash-boards, (attached by a rope,) which floated with the tide ; and he maintained and used the same until 1863, when the city of Charlestown was authorized by the St. of 1863, *c.* 9, for the purpose of constructing its waterworks, to tem-

porarily lower the waters of Mystic Pond by erecting temporary gates across Mystic River. The defendant then, by authority of an agreement with that city, constructed at the same place a dam with piles and planks, and made excavations in the bed of the stream above and below. The city agreed to restore the river to its original condition after the completion of its waterworks; but, instead of doing so, allowed the defendant to enter and use the new structure, and he did so until the governor and council, in 1867, upon the recommendation of the harbor commissioners, and under the authority conferred by the St. of 1863, c. 9, § 2, caused the dam to be removed. The defendant then restored his own dam substantially as at first, and continued to maintain and use it until July 29, 1870, when some persons, acting on their own responsibility, tore it down. This information was filed and served upon him before he had an opportunity to rebuild it; but he has rebuilt it since the information was filed. The defendant owns the land on each side of the river. There are five bridges between the place in question and the sea. The river flows into Boston harbor, and has been used from time immemorial for pleasure boating from that harbor to Mystic Pond, and since 1851 pleasure boats have passed this dam daily during the summer. Their passage is seriously obstructed by the dam. It was not shown that the river at this place was or had been used by boats for any other purpose. Mystic Pond is a tidal reservoir. The effect of the tide is felt above the dam. Salt water flows into the pond during the dry season, but rarely does so in the wet season, the waters flowing from the pond being accumulated in the stream by the rising tide. At the dam the average rise and fall of the tide is about two feet, and the depth of the channel at low water is about two feet. The dam interferes with the flow of the tide, but was not proved to injure the harbor to any appreciable extent.

The judge reserved the case for the determination of the full court, who were to enter such decree therein as justice and equity might require.

*D. E. Ware*, (*C. Allen*, Attorney General, with him,) for the Commonwealth.

*C. R. Train*, for the defendant.

CHAPMAN, C. J. The information is filed at the relation of the harbor commissioners of the Commonwealth to restrain the rebuilding of a dam across Mystic River, a small stream flowing into Boston harbor. It has been used from time immemorial for pleasure boating between the harbor and Mystic Pond, which is situated a short distance above the dam. Since 1851, pleasure boats have passed the dam daily during the summer, and their passage has been seriously obstructed by the dam.

It is denied by the defendant that the river at this place is within tide water, because, it is said, although the rise and fall there is two feet, it is occasioned by the meeting of the salt water of the tide with the fresh water which comes down the stream. But the law on this point is well settled. It is the rise and fall of the water, and not the proportion of salt water to fresh, that determines whether a particular portion of a stream is within tide water. This was settled in *The King* v. *Smith*, 2 Doug. 441, in application to the Thames at London ; in *Peyroux* v. *Howard*, 7 Pet. 324, 338, in respect to the Mississippi at New Orleans ; and in *Lapish* v. *Bangor Bank*, 8 Maine, 85, in respect to the Penobscot at Bangor. The same doctrine must apply to small streams as to large ones. We have no doubt that the defendant's dam is within tide water.

It is also denied that the stream is navigable, although it is about two feet deep at low water, because it is not proved to be used for the purposes of navigation except with pleasure boats. The case of *Rowe* v. *Granite Bridge Co.* 21 Pick. 344, 347, is cited to sustain this position. Chief Justice Shaw there says : " It is not every small creek in which a fishing skiff or gunning canoe can be made to float at high water, which is deemed navigable. But in order to have this character it must be navigable to some purpose useful to trade or agriculture." The same thing, in substance, is stated in *Charlestown* v. *County Commissioners*, 3 Met. 202, and *Murdock* v. *Stickney*, 8 Cush. 113, 115. But this language is applied to the capacity of the stream, and is not intended to be a strict enumeration of the uses to which it must be actually applied in order to give it this character. Navigable streams are highways ; and a traveller for pleasure is as fully en-

titled to protection in using a public way, whether by land or by water, as a traveller for business. Certainly fishing and fowling are as really regarded, on navigable waters, as trade and agriculture, though not mentioned in the case cited above ; and in *West Roxbury* v. *Stoddard*, 7 Allen, 158, 171, it is said that the use of great ponds, which are public property, may as well be for bathing, boating, skating, fishing and fowling, as for business, and is entitled to equal consideration. If water is navigable for pleasure boating, it must be regarded as navigable water, though no craft has ever been upon it for the purposes of trade or agriculture. The purpose of the navigation is not the subject of inquiry, but the fact of the capacity of the water for use in navigation. The use that is actually made of Mystic River proves that it is navigable. The dam is within the public domain, for at the point where the tide, from natural causes, ebbs the lowest, is the boundary of the flats beyond which private titles do not reach. *Sparhawk* v. *Bullard*, 1 Met. 95, 107. Beyond that point the legislature has control, for the common benefit of the public, and structures that interfere with the common right of navigation are a nuisance at common law. The legislature has a right to make reasonable restraints for the protection of the public, and enforce them by reasonable penalties. *Commonwealth* v. *Alger*, 7 Cush. 53, 92.

By the St. of 1866, *c.* 149, the legislature has made provision for these public interests. It creates a board of harbor commissioners, and confers on them the general care and supervision of all our harbors and tide waters, and the flats and lands flowed by such tide waters, except the Back Bay lands, respecting which other provisions are made. It designates particularly some of the duties of the commissioners. By § 5, all erections and works made without authority from the legislature, or in any manner not sanctioned by the commissioners, when their direction is required as provided in the statute, within tide waters flowing into or through any harbor, shall be considered public nuisances, and liable to indictment as such. The prohibition extends to ordinary high water mark. *Commonwealth* v. *Roxbury*, 9 Gray, 451. *Commonwealth* v. *Charlestown*, 1 Pick. 180. The defend-

ant's dam is within this clause, there being no authority for its erection, derived either from the legislature or the commissioners.

This section further provides that the commissioners shall have power to order suits on behalf of the Commonwealth to prevent or stop, by injunction or otherwise, any such erection or other nuisance in the tide waters which flow into or through any harbor in the Commonwealth. The attorney general and district attorneys are directed to commence and conduct such suits.

It is contended that no remedy in equity exists, if there is a full, adequate and complete remedy at law; and that an injunction should not issue unless it appears that irreparable injury is to be prevented; and authorities which are applicable to ordinary suits in equity are cited to sustain these positions. But the statute gives special remedies, and designates the cases to which this shall be applied. The remedy by injunction is cumulative.

The purpose of the statute is, not only to punish all encroachments upon this portion of the public domain, but to furnish means for their prevention or removal. It cannot be doubted that the legislature has power to do this, and to prohibit all invasions of the rights of the public without regard to the amount of damage occasioned by them. But in the present case the report finds that the obstruction to the navigation of the river by the defendant's dam is such as to create a nuisance of a serious character, *Injunction to issue.*